IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-00494-D

SHARON ROSE BEAVERS,                )
                                    )
        Plaintiff/Claimant,         )
                                    )
                                    )           **MEMORANDUM AND**
        v.                          )           **RECOMMENDATION**
                                    )
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
        Defendant.                  )

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-21, -25] pursuant to Fed. R. Civ. P. 12(c). Claimant Sharon Rose Beavers ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). Claimant also filed a response to the Commissioner's motion. [DE-28]. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be upheld.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on June 7, 2010, alleging disability beginning May 1, 2007. (R. 154-57, 169-71). Her claim was denied initially and upon reconsideration. (R. 61-83). On February 7, 2012, the Administrative Law Judge ("ALJ") held a hearing at which Claimant was represented by counsel and a vocational expert ("VE") testified. (R. 31-60). On March 8, 2012, the ALJ issued a decision denying Claimant's request for benefits

(R. 7-20), and on May 7, 2013, the Appeals Council denied Claimant's request for review (R. 1-5). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth

2

in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges that the ALJ improperly evaluated the medical opinion of her treating physician and her credibility. Pl.'s Mem. [DE-22] at 3-13.

### IV. FACTUAL HISTORY

A.  **ALJ's Findings**

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial

3

gainful activity since the alleged onset date. (R. 12). Next, the ALJ determined Claimant had the following severe impairments: carpel tunnel syndrome, right (status post surgical release); right sided tenosynovitis; right lateral epicondylitis; and tendinitis. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] with the additional limitations of lifting no more than ten pounds at a time; standing and walking for six hours in an eight-hour workday; frequent, but not constant use of her upper extremities; and no use of a keyboard or typing. (R. 13-15). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 14). At step four, the ALJ concluded Claimant is unable to perform the requirements of her past relevant work. (R. 15). However, at step five the ALJ determined that there are jobs existing in significant numbers in the national economy that the Claimant can perform. (R. 16). Thus, the ALJ found Claimant was not disabled. (R. 17).

## B. Claimant's Testimony at the Administrative Hearing

Claimant was 52 years of age, married, and living with her husband at the time of the administrative hearing. (R. 34-35). Claimant is a high school graduate and earned some college credits. (R. 37). Claimant worked from 1985 to 1995 for a bank and reentered the work force in

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

4

1999 doing temporary work; all were administrative assistant positions. (R. 40). She last worked as an administrative assistant and data entry clerk at North Carolina State University from 2002 until May 2007. (R. 38-40). As an administrative assistant her duties involved communicating by telephone with minority contractors and inputting their information into a spreadsheet. (R. 40). Claimant held the phone to her ear with her right shoulder, so that she could type and talk at the same time, and also sat in an ill-fitting chair, resulting in shoulder, back, and elbow problems. (R. 40-42). Claimant saw several health care providers, including a chiropractor and orthopedist, but felt they were not helpful. (R. 42). Claimant later moved to a data entry position and started experiencing pain in her elbow and forearm. (R. 43). She sought treatment and received injections in her elbow in December 2006, and was out of work for three months or more. *Id.* Claimant stopped working in May 2007 due to her impairments and was unable to return to work. *Id.* She received worker's compensation payments after she stopped working. (R. 37-38).

Claimant was eventually diagnosed with carpal tunnel, tendinitis, and epicondylitis and underwent carpel tunnel release surgery, but continues to have pain. (R. 43-44). Claimant's impairments affect most everything she does, such as preventing her from using a computer and interfering with her ability to cook, because she cannot cut or grip a knife, and she experiences flare-ups when she attempts to engage in such activities. (R. 44-45). Claimant's doctor has restricted her to lifting and pushing or pulling no more than five pounds, no keyboard use, and no repetitive activity. (R. 45).

On a typical day, Claimant wakes, makes her bed, makes breakfast for herself, showers, prioritizes her chores, washes dishes, takes a break, and then continues with housework. (R. 49). She does chores in sections, such as doing one load of laundry per day or cleans small areas at a time,

and her husband helps with many things she used to do independently, such as cooking. (R. 47-48). Claimant once shucked a box of corn and was "laid up" for several days due to pain. (R. 48). Claimant has two adult children in nearby towns, and she travels by car to visits them often, but her husband usually drives. (R. 35-36). Claimant and her husband share a vehicle, which he drives to work, so she drives only occasionally, but had recently driven from home to church. (R. 36). Claimant shops once a week, but usually has someone with her to lift things and drive (because her husband has the car), and when she does drive she mostly uses her left hand. (R. 46, 49). Claimant has five grandchildren but is unable to babysit due to her impairments. (R. 47). Sometimes she accompanies a neighborhood friend on hospital visits for the sick. (R. 49).

C.  **Vocational Expert's Testimony at the Administrative Hearing**

Stephen Carpenter testified as a VE at the administrative hearing. (R. 50-58). After the VE testified as to Claimant's past work (R. 50-51), the ALJ asked the VE to assume a hypothetical individual with the functional capacity to stand and walk for six hours out of an eight hour day, who can lift no more than 10 pounds at a time, is restricted to jobs with frequent but not constant use of the upper extremities and no use of the upper extremities in keyboarding or typing, and whether any jobs exist in significant numbers in the region that such a person would be vocationally qualified to perform based upon the Claimant's age, education, training, and background (R. 51-52). The VE responded that it would be difficult to transfer skills with the keyboarding restriction, but suggested such an individual could perform unskilled jobs, such as photocopying machine operator (DOT # 207.685-014, strength level light, unskilled), cafeteria attendant (DOT # 311.677-010, strength level light, unskilled), and stock checker (DOT # 299.667-014, strength level light, unskilled). (R. 52-53). The ALJ next asked the VE if there would be any jobs assuming the added restrictions testified to

by Claimant in combination with the restrictions in the hypothetical question. (R. 53). The VE indicated there would be no jobs available, based on Claimant's testimony regarding limits on her hand use:

> It appears, based on testimony, she has difficulty sustaining hand use over time. Over time, gross upper extremity dexterity, fine hand and finger dexterity, appear to be severely impaired according to her testimony, which would indicate her ability to use the hand for reach, handle, finger, feel would be, for both gross and fine, dexterity would be, at most, occasional.

(R. 53).

Claimant's counsel elicited testimony from the VE indicating that the cafeteria attendant job would require the individual to exceed the 10 pound lifting limitation set forth by the ALJ, and the VE then cited the job of inserting machine operator (DOT # 208.685-018, strength level light, unskilled) as a job requiring lifting of no more than 10 pounds. (R. 54). The VE also indicated that the jobs of photocopy machine operator and inserting machine operator were performed at work stations and are between sedentary and light exertion levels, but classified as light. (R. 55). Considering the limitations found by Dr. Tuttle in Exhibit 13F, the VE testified that a five pound lifting restriction would preclude performance of the jobs identified by the VE and that no other jobs exist in significant numbers for an individual with such restrictions. (R. 56). The VE also indicated that limitations of no repetitive use of the right hand and no keyboarding may or may not eliminate the identified jobs, explaining that if repetitive means constant use (meaning more than two-thirds of a workday) then it would not preclude the identified jobs which require occasional to frequent use of the dominant upper extremity, but if repetitive means frequent, then it would preclude the identified jobs. (R. 56-58). Finally, the VE indicated that the restrictions of no keyboard use and no repetitive use of the dominant upper extremity would significantly impair the sedentary

7

occupational base. (R. 58).

## V. DISCUSSION

### A. The ALJ's Evaluation of the Medical Opinion Evidence

Claimant contends the ALJ erred by rejecting the opinion of Dr. Tuttle, Claimant's treating orthopedic surgeon, that Claimant could lift no more than five pounds. Pl.'s Mem. at 3-7. The Commissioner contends that the ALJ considered Dr. Tuttle's opinion and sufficiently explained his reasons for not giving it controlling weight. Def.'s Mem. [DE-26] at 21-25. The undersigned agrees with the Commissioner that the ALJ adequately explained the weight given to Dr. Tuttle's opinion and his decision is supported by substantial evidence.

The rules regarding the weight to be accorded medical opinion evidence and the ALJ's duty to explain such weight are well established. Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. § 404.1527(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. 20 C.F.R. § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.* Similarly, "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); *see Mastro*, 270 F.3d at 178 (explaining "the

8

ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted). However, the ALJ must give "good reasons" for the weight assigned to a treating source's opinion. *See* 20 C.F.R. § 404.1527(c)(2); *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam). Where a physician presents relevant evidence to support his opinion, his opinion is entitled to more weight. 20 C.F.R. § 404.1527(c)(2).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006), he must nevertheless explain the weight accorded such opinions. *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8. "In most cases, the ALJ's failure to consider a physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand." *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (citing *Hill v. Astrue*, 698 F.3d 1153, 1159-60 (9th Cir. 2012); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747, 750 (6th Cir. 2007); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006)). However, "[i]n some cases, the failure of an ALJ to explicitly state the weight given to a medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the

decision and any grounds for discounting it are reasonably articulated." *Bryant v. Colvin*, No. 5:11-CV-648-D, 2013 WL 3455736, at *5 (E.D.N.C. July 9, 2013) (citations and quotations omitted).

Here, the opinion at issue appears on a form dated January 25, 2012, on which Dr. Tuttle checked boxes indicating Claimant was restricted in "Lifting" and "Pushing/pulling" and "none over 5 lbs" was noted. (R. 379). The box "Other restrictions/comments" was also checked and "No repetitive use of right hand. No lifting/push/pulling over 5 lbs. No keyboarding or typing" was noted. *Id.* The ALJ stated the limitations imposed by Dr. Tuttle were "only partially supported by the findings in the treatment notes," concluding that the restriction of no keyboarding or typing was supported by the record, but declining to give controlling weight to the five pound lifting and pushing/pulling restriction as "inconsistent with the medical records as a whole." (R. 15). As an example of such inconsistency, the ALJ cited Dr. Tuttle's treatment notes from April 11, 2011, finding Claimant's grip strength to be fairly strong, though a little weaker than the left hand, and concluding, "I think she is making excellent improvement. Her preoperative symptoms seem to be resolved." (R. 15 (citing R. 378)).

Claimant asserts that Dr. Tuttle's opinion is consistent with the record as whole, which shows Claimant's hand and arm problems have "chronically persisted and were repeatedly aggravated by activity." Pl.'s Mem. at 6. However, the medical records cited by Claimant in support of this contention either pre-date her carpel tunnel release surgery (R. 348-49, 351, 365-70) or indicate that Claimant showed considerable postoperative improvement (R. 376 (noting no postoperative numbness or tingling, no particular problems, and encouraging stretching to address tendinitis symptoms), R. 377 (noting Claimant "overall doing reasonably well after carpal tunnel release" and recommending scar massage), R. 378 (noting continued resolution of numbness and tingling in

10

fingers, palmer pain is "much better," Claimant thinks therapy was "quite beneficial," "excellent improvement," "preoperative symptoms seem to be resolved")). The ALJ, in weighing the evidence, was free to assign less weight to Dr. Tuttle's opinion where his treatment notes did not support the degree of limitation suggested. *See Jones v. Colvin*, No. 5:12-CV-00567-FL, 2013 WL 5460197, at *12 (E.D.N.C. Sept. 30, 2013) (adopting memorandum and recommendation finding the ALJ did not err is assigning "little weight" to a medical opinion where the physician's treatment notes did not support the degree of limitation found by the physician).

Furthermore, Dr. Tuttle's form opinion is arguably entitled to less weight given the lack of explanation associated with the continued lifting restrictions, despite postoperative improvement. *See McGlothlen v. Astrue*, No. 7:11-CV-148-RJ, 2012 WL 3647411, at *6 (E.D.N.C. Aug. 23, 2012) (finding no error in ALJ's assignment of little weight to form opinion lacking explanation and where accompanying treatment notes did not support the functional limitations stated in the form opinion) (citing *Nazelrod v. Astrue*, 2010 WL 3038093, at *6 (D. Md. Aug. 2, 2010) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."))). "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *see Scivally v. Sullivan*, 966 F.2d 1070, 1076-77 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel*, 166 F.3d 1209, 1999 WL 7864, at *2 (4th Cir. 1999) (citation omitted). There is no such indication here, where the ALJ sufficiently explained the weight accorded Dr. Tuttle's opinion and the ALJ's decision is supported by substantial evidence.

11

## B. The ALJ's Credibility Assessment

Claimant contends that the ALJ erred in finding Claimant's testimony not fully credible, specifically contesting the ALJ's finding that Claimant was capable of engaging in frequent use of the upper extremities. Pl.'s Mem. at 7-13. The Commissioner contends that the ALJ's credibility assessment and related RFC finding is supported by substantial evidence. Def.'s Mem. at 12-18. The undersigned finds no error in the ALJ's credibility assessment.

It is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.") (citation omitted). Federal regulations 20 C.F.R. §§ 404.1529(a) and 416.929(a) provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *See Craig*, 76 F.3d at 593-94. First, as an objective matter, the ALJ must determine whether Claimant has a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Id.*; *see also* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). If this threshold question is satisfied, then the ALJ evaluates the actual intensity and persistence of the pain or other symptoms, and the extent to which each affects a claimant's ability to work. *See Craig*, 76 F.3d at 595. The step two inquiry considers "all available evidence," including objective medical evidence (i.e., medical signs and laboratory findings), medical history, a claimant's daily activities, the location, duration, frequency and intensity of symptoms, precipitating and aggravating factors, type, dosage, effectiveness and adverse side effects of any pain medication, treatment, other than medication, for relief of pain or other symptoms

12

and functional restrictions. *Id.*; *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at *3. The ALJ may not discredit a claimant solely because her subjective complaints are not substantiated by objective medical evidence. *See Craig*, 76 F.3d at 595-96. However, neither is the ALJ obligated to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2.

The ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible. (R. 14). Claimant asserts that the ALJ's use of this commonly utilized template language was error, citing the non-binding, out-of-circuit case of *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012). The court has previously addressed *Bjornson*, concluding "[w]hile *Bjornson* is not binding on this court, it also does not stand for the proposition that use of this template language necessitates remand." *Mascio v. Colvin*, No. 2:11-CV-65-FL, 2013 WL 3321577, at *3 (E.D.N.C. July 1, 2013). Had the ALJ's credibility determination ended with the template language to which Claimant objets, remand might well be warranted. However, the ALJ extensively recounted Claimant's medical records, opinion evidence, and hearing testimony in assessing Claimant's credibility and formulating Claimant's RFC. (R. 13-15). Accordingly, the ALJ's use of the allegedly improper template language does not merit remand in this case.

Claimant next contends that the ALJ's stated reasons for discounting Claimant's credibility regarding her limitations are not supported by substantial evidence. The ALJ provided the following analysis regarding Claimant's subjective complaints limiting the use of her hands, wrists, and

13

forearms:

> In terms of the claimant's allegations of disabling symptoms and complaints of carpal tunnel syndrome, she testified she was able to shop and she performs her household chores by doing it "in sections," and "a little each day." Although the claimant complained of alleged pain in her wrist and carpal tunnel syndrome, she had also testified that she had 'shucked corn." In June 2010, Dr. Patterson had stated that the claimant had full motion in her shoulder, elbow and her wrist. He had further noted that the claimant only had mildly positive carpal tunnel compression as well. Dr. Tuttle stated on April 11, 2011, that the claimant had made "excellent improvement." In a consultative examination on March 14, 2011, Dr. Samia had noted that the claimant acknowledged that she was able to cook, do laundry, clean her bathroom, mop, sweep, shop, drive, turn a doorknob, grasp objects, and write. These factors indicate that the claimant's allegations of functional restrictions are not fully credible.

(R. 15). Claimant correctly points out that the ALJ, while noting that Claimant "shucked corn," failed to mention that the activity severely aggravated her symptoms. (R. 48). Yet, that Claimant would think herself capable of engaging in this type of activity in the first place casts doubt on her credibility as to the severity of her limitations. Nevertheless, other reasons provided by the ALJ constitute sufficient substantial evidence supporting the ALJ's credibility analysis.

As discussed above with respect to Dr. Tuttle's opinion, his postoperative treatment notes, in particular from April 11, 2011, indicate that Claimant's carpel tunnel release surgery was successful and resulted in "excellent improvement" and that her "preoperative symptoms seem to be resolved." (R. 378). Claimant asserts the ALJ failed to acknowledge that Dr. Tuttle also indicated Claimant's symptoms improved, but her function did not. *Id.*; Pl.'s Mem. at 10. However, as discussed above, the ALJ was free to give Dr. Tuttle's opinion less weight where the suggested limitations were not supported by his treatment notes. Furthermore, Claimant also fails to fully recount Dr. Tuttle's statement–that Claimant did not need an Functional Capacity Evaluation ("FCE"), because Claimant had one in 2008 and he did not think she would have significantly more

14

function than she did *at that point*. (R. 378). The 2008 FCE referred to by Dr. Tuttle does not appear to be in the record, and Claimant does not cite to it in her brief. Thus, the ALJ's reliance on Dr. Tuttle's April 11, 2011 treatment note does not patently undermine the ALJ's credibility determination as Claimant suggests.

Moreover, Dr. Tuttle's treatment notes from 2008 through 2011 are not at odds with the ALJ's credibility and RFC assessments. Dr. Tuttle's June 5, 2008 treatment note indicates that Claimant was "minimally, if at all symptomatic," "quite happy with her forearm at this point," and "significantly improved; no clinical evidence of right lateral epicondylitis or dorsal wrist tendinitis today." (R. 354). Dr. Tuttle also recommended at that time that Claimant return to work, but not at her previous job, so as to avoid a recurrence of her symptoms. *Id.* The ALJ likewise found that Claimant could not return to her previous work, or any work that required keyboarding. (R. 13, 15). Dr. Tuttle's August 5, 2008 treatment note indicates that Claimant reported her symptoms to be fairly minimal and examination showed full range of motion of the elbow, wrist, and fingers, full grip strength, and no pain to palpation of the elbow and wrist, but that Claimant had additional pain in her shoulder that may need attention. (R. 352). Subsequent records show Claimant's symptoms worsened throughout 2009 and 2010, culminating in the successful carpel tunnel release in 2011. (R. 346-51, 374-75). Accordingly, the ALJ's determination that Claimant could lift ten pounds and frequently, but not constantly, use her upper extremities with the further restriction of no keyboarding is not contradicted by Dr. Tuttle's treatment notes.

Claimant also contends that the ALJ's reliance on Claimant's statements to Dr. Samia regarding her daily activities was error. Dr. Samia indicated that Claimant responded yes when asked if she could cook, do laundry, clean the bathroom, mop, sweep, shop, drive, visit friends,

15

watch television, stand, sit, lie down, squat, dress herself, walk without assistance, turn doorknobs, grasp objects, raise arms overhead, write, read, and walk a mile. (R. 371). The ALJ cited a number of these factors as evidence that Claimant's allegations of her functional restrictions were not fully credible. (R. 15). Claimant contends the fact that she can engage in these activities at all does not conflict with her testimony that she cannot sustain such activities for any length of time. Pl.'s Mem. at 10. Claimant does not assert that she communicated any limitations to Dr. Samia regarding her ability to engage in these activities, and Dr. Samia's record makes no mention of any such limitations. (R. 371). Thus, despite her attempts to reconcile them after the fact, Claimant's statements to Dr. Samia were inconsistent with her testimony to the ALJ. It is within the ALJ's province to determine credibility and, in fulfilling that function, the ALJ is entitled to consider inconsistencies between a claimant's testimony and the evidence of record. *See Mickles v. Shalala*, 29 F.3d 918, 929 (4th Cir. 1994) ("Subject only to the substantial evidence requirement, it is the province of the [ALJ], and not the courts, to make credibility determinations[.]"). Here, the ALJ properly considered an inconsistency in the record, and the court may not "revisit inconsistent evidence." *Tomsich v. Colvin*, No. 7:13-CV-85-D, 2014 WL 3546546, at *4 (E.D.N.C. July 17, 2014) (citing *Craig*, 76 F.3d at 589; *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).

Finally, the ALJ did give some weight to Claimant's subjective complaints of pain and her asserted limitations. The State Agency medical consultants opined that Claimant could lift 20 pounds occasionally and 10 pounds frequently. (R. 67, 79). The ALJ, citing Claimant's hearing testimony, gave this evidence "little weight" because it failed to sufficiently account for Claimant's impairments and limitations, and the ALJ further limited Claimant to lifting no more than 10 pounds at a time. (R. 15). The ALJ considered Claimant's testimony, the objective medical evidence, and

16

the medical opinions in formulating the RFC, and limited Claimant to less than a full range of light work based on her subjective complaints. The ALJ applied correct legal standards in assessing Claimant's credibility, and the ALJ's determination is supported by substantial evidence in the record. Thus, the ALJ's credibility finding is entitled to substantial deference. *See Shively*, 739 F.2d at 989-90 (noting an ALJ's observations regarding credibility should be given great weight) (citation omitted). Accordingly, there is no error in the ALJ's evaluation of Claimant's credibility.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-21] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-25] be ALLOWED, and the decision of the Commissioner be upheld.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days upon receipt to file written objections, response to which (if any) must be made within seven (7) days upon receipt of the written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, this the 25th day of August 2014.

Robert B. Jones, Jr.
United States Magistrate Judge